Judge Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR-09-0084-MJP |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM RE: DAVID SOBOL |
| v. | |
| DAVID SOBOL, | |
| Defendant. | [Hearing Date: December 4, 2009] |

## I.  INTRODUCTION

Defendant David Sobol comes before the Court having pled guilty to conspiring to commit bank fraud, mail fraud, and wire fraud in violation of Title 18, United States Code, Section 371.  Defendant Sobol's five co-conspirators, Vladislav Baydovskiy, Viktor Kobzar, Camie Byron, Alla Sobol and Sandra Thorpe all entered guilty pleas to the same charge.  A seventh defendant, Donata Baydovskiy, entered a guilty plea to making a false statement in a matter occurring before the Department of Housing and Urban Development.  The false statement was made during the course of the charged conspiracy.

The charged conspiracy arose from a scheme to defraud lending institutions into making mortgage secured purchase money and refinance loans.  An additional aspect of the scheme included defrauding otherwise unqualified prospective borrowers to secure purchase money loans based on false and fraudulent representations.  The defendants profited from the scheme by charging excessive fees and diverting some of the fraudulently obtained loan

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 1

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   proceeds to themselves.  The scheme succeeded in large part due to the defendants'

2   ownership and operation of both a mortgage loan brokerage business (Kobay and

3   Nationwide) and an escrow operation (Emerald City Escrow).  Defendant David Sobol's role

4   in the charged scheme included managing the day-to-to day operations of Emerald City

5   Escrow.

6                    **II.   FACTUAL BACKGROUND**

7          The facts and circumstances underlying the offense conduct for which Mr. Sobol pled

8   guilty are summarized in the Plea Agreement and Presentence Report. (See Plea Agreement,

9   pp. 6-9; P.S.R. ¶¶ 14-34).  The first section of the agreed statement in the Plea Agreement is

10  repeated below for the court's convenience.

11         Emerald City Escrow, LLC ("Emerald City") was a Washington State limited liability

12  company established on or about September 15, 2005.  Emerald City commenced operations

13  in February 2006 and ceased operations in December 2008.  The Defendant and his co-

14  conspirators caused the filing of documents with the Washington Secretary of State's Office

15  establishing Emerald City and identifying the Defendant as a manager of the business.

16  Emerald City was engaged in the business of acting as an intermediary to facilitate the

17  purchase and sale of real property.  Emerald City, through the actions of its employees and

18  principals, prepared, obtained and delivered written instruments, money, and other things of

19  value to complete or close real property transactions.  The Defendant was a licensed real

20  estate agent in the State of Washington, and managed the day-to-day office operations of

21  Emerald City.

22         Beginning with the commencement of co-conspirator Alla Sobol's ownership interest

23  in Nationwide Home Lending, LLC in September 2006, and continuing through December

24  2008, in the Western District of Washington and elsewhere, the Defendant and his co-

25  conspirators willfully and knowingly conspired, combined, confederated and agreed among

26  themselves, and with other persons, to defraud financial institutions by, among other things:

27  (a) locating residential real properties that were available for purchase and recruiting straw

28  buyers or otherwise unqualified buyers to participate in purchasing the properties; (b) falsely

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   inflating the value of the properties, (c) submitting false and fraudulent mortgage loan

2   applications, title documentation, and related documents to financial institutions, thereby

3   causing lenders to make loans; (d) creating false and fraudulent documents intended to

4   conceal the diversion of loan proceeds to the defendants; and (e) diverting fraud proceeds for

5   their personal use and benefit, and to further the fraud scheme.

6        It was part of the conspiracy that the co-conspirators located residential properties

7   available for purchase and recruited individuals to act as buyers of the located properties.

8   These individuals, otherwise known as "straw buyers," would allow their identities and credit

9   to be used by members of the conspiracy to purchase the properties.  In most cases, the straw

10   buyers had no intention of permanently owning or occupying the properties.  In many cases,

11   members of the conspiracy paid straw buyers for participating in purchasing selected

12   properties and told straw buyers that they would pay for expenses associated with ownership,

13   including mortgage payments, property taxes, and utilities during their titular ownership of

14   the property.

15        In addition to using straw buyers, members of the conspiracy recruited individuals

16   who were otherwise unqualified to obtain financing to purchase properties.  These

17   unqualified purchasers were misled by members of the conspiracy who failed to disclose the

18   true financing arrangements underlying the purchase transactions.  These otherwise

19   unqualified individuals were told they would realize significant profits by purchasing the

20   selected properties and subsequently selling the properties to third parties.

21        Members of the conspiracy would prepare, or cause others to prepare, a Uniform

22   Residential Loan Application ("Loan Application") to facilitate the scheme to defraud.  The

23   Loan Application, commonly referred to as a mortgage loan application, or Form 1003, is a

24   universally used mortgage loan application developed by federal government agencies and

25   utilized by financial institutions and other lenders in the mortgage loan approval process.

26   The Loan Application requires prospective borrowers to submit a complete and accurate

27   financial history, including employment information, monthly income, assets and liabilities,

28   details of the residential real estate transaction, and whether the property will be used as the

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 3

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  borrower's primary residence.  Members of the conspiracy, and others acting on their behalf,

2  caused the Loan Applications for the straw buyers and otherwise unqualified buyers to be

3  prepared based upon fraudulent representations related to gross monthly income, employment

4  status, assets and liabilities, and whether the property would be used as the primary

5  residence.  Members of the conspiracy then submitted, or caused to be submitted, the false

6  and fraudulent Loan Applications, together with the false and fraudulent supporting

7  documentation related to income, assets, liabilities, employment status, and tax information

8  to prospective lenders to secure mortgage backed financing.  Some of the lenders were

9  financial institutions as defined in Title 18, United States Code, Section 20.

10      Using escrow services provided by Emerald City Escrow, the Defendant or his co-

11  conspirators created, and caused others to create, false HUD-1 Settlement Statements.

12  HUD-1 Statements are standard forms used to facilitate the closing of residential real estate

13  purchase and sale transactions.  They are used to identify and allocate expenditures and

14  payments associated with the transaction.  Lending institutions rely on the accuracy of

15  HUD-1 Statements to ensure loan proceeds are applied appropriately to protect the lender's

16  security interest in the purchased property.

17      The Defendant or his co-conspirators prepared and submitted false HUD-1 Statements

18  to lending institutions.  False and fraudulent HUD-1 Statements were used to conceal the

19  underlying purchase and sale transaction in which the negotiated sale price was often less

20  than that represented on the falsified Statement.  The Defendant or his co-conspirators

21  prepared multiple HUD-1 Statements in an effort to conceal from purchasers and lenders the

22  true nature of expenditures and payments associated with the purchase and sale transaction.

23      The Defendant or his co-conspirators used false and fraudulent HUD-1 Statements to

24  facilitate the diversion of a significant portion of the loan proceeds from escrow accounts for

25  their personal benefit.  In some cases, a portion of the diverted loan proceeds were used to

26  make payments on fraudulently obtained loans to delay defaulting on the obligation and

27  facilitate further fraud by using the acquired property for subsequent fraudulent transactions.

28

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 4

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

# III.  ADVISORY GUIDELINE CALCULATION

The parties' plea agreement does not include an agreed advisory guideline calculation. Based on the offense characteristics, the government contends the following calculation is accurate:

a.   A base offense level of six (6), pursuant to USSG § 2B1.1.(a)(2)   ........   6

b.   An eighteen (18) level increase pursuant to USSG § 2B1.1.(b)(1)(D) because a reasonable estimation of the actual losses sustained by the victims of the mortgage fraud scheme was more than $2.5 million but not more than $7.0   ....................................   18

c.   A two (2) level increase pursuant to USSG § 2B1.1.(b)(2)(A) because the offense involved 10 or more victims....................................   2

d.   A two (2) level increase pursuant to USSG § 2B1.1 (b)(9) because the offense otherwise involved sophisticated means...............................   2

e.   A three (3) level increase pursuant to USSG § 3B1.1.(b) because the defendant was a manager or supervisor of the scheme to defraud .........   3

e.   Acceptance of Responsibility ...............................................   [3]

TOTAL ADJUSTED OFFENSE LEVEL  .............................   28

This proposed calculation differs from that offered by the Probation Office.  According to the Probation Office, the two level enhancement pursuant to USSG § 2B1.1.(b)(9) is not applicable because the scheme perpetrated by Defendant Sobol and her co-conspirators did not otherwise involve sophisticated means.  The resulting advisory guideline range, based on the the government's recommended total adjusted offense level of 28 would be 78 to 97 months applying a criminal history category of I.  The five year statutory maximum sentence under the charged and agreed violation of 18 U.S.C. § 371 effectively caps the advisory guideline range at 60 months.

## A.   A Reasonable Estimate Of The Loss For Guidelines Purposes Is More Than $2.5 Million But Not More Than $7.0 Million

The government and counsel for defendants Camie Byron and David Sobol have stipulated that the government can establish an estimated loss amount attributable to the admitted fraud for purposes of calculating the applicable offense level of between $2.5 million and $7.0 million.  It is anticipated that counsel for defendant Alla Sobol will join in

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 5

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

that stipulation.  The stipulation was sought in the interest of avoiding a potentially protracted evidentiary hearing for the limited purpose of establishing a reasonable estimate of the loss.[1]  Recognizing that the court must make its own loss determination, the government offers the following legal points.

Absent the stipulation, the government anticipates that the defendants will each contest the loss amount as preliminarily calculated by the Probation Office and the government.  While the government readily concedes that establishing a precise loss amount may be problematic, such precision is not required.  *See, e.g. United States v. Showalter,* 596 F.3d 1150, 1161 (9th Cir. 2009)("a district court has a number of permissible methods for determining monetary loss, and 'need not make its loss calculation with absolute precision.'") citing *United States v. Zolp,* 479 F.3d 715, 719; *United States v. Garro,* 517 F.3d 1163, 1167 (9th Cir. 2008)("loss need not be determined with precision, but need only be a reasonable estimate...given the available information); *United States v. Miller,* 188 F.3d 1312, 1317 (per curiam) (11th Cir. 1999) (explaining that courts may reasonably estimate the amount of loss because  "often the amount of loss caused by fraud is difficult to determine accurately.").  As discussed below, the government's proffered loss amount attributable to the charged and admitted scheme is a reasonable estimate supported by reliable and sufficient evidence.

### 1.    The Government's Proposed Methodology Is Consistent With The Guidelines And Ninth Circuit Authority

U.S.S.G. § 2B1.1(b)(1) provides for an increase in the base offense level based on the loss amount.  Application Note 3(A) defines loss as "the greater of actual loss or intended loss that resulted from the offense."  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  Application Note 3(A)(I). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense . . . and . . . includes

---

[1] The stipulation specifically provides that it shall not apply to the judicial determination of restitution in this case. The parties are free to advocate for any amount of restitution, wholly independent of the stipulated loss range.  In addition, evidentiary submittals offered to substantiate the agreed loss estimate for guidelines purposes are not to be cited to the court for purposes of challenging any proffered claim for restitution.

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 6

UNITED STATES ATTORNEY
700 Stewart Street, Suite S220
Seattle, Washington 98101-1271
(206) 553-7970

1  intended pecuniary harm that would have been impossible or unlikely to occur . . . ."

2  Application Note 3(A)(ii).

3     As to determining the loss, "[t]he court need only make a reasonable estimate of the

4  loss." Application Note 3(C).  *See also United States v. Lutz*, 154 F.3d 581, 590 (6th Cir.

5  1998) ("In determining the loss for sentencing purposes, a district court need only make a

6  reasonable estimate of the loss, and this court reviews for clear error and reverses the

7  valuation only if it is outside the realm of permissible computations.") (citation omitted).[2]

8     In the case of collateral pledged or provided by the defendant, a credit must be applied

9  based on the fair market value or disposition amount of the collateral at the time of

10 sentencing.  Application Note 3(E)(ii).  Notably, this basis for reducing the amount of the

11 loss turns on the defendant's own efforts or own collateral, not the efforts or collateral of a

12 third party.

13    Courts have approved a common methodology for assessing a reasonable estimation

14 of loss in cases with mortgage fraud schemes employing practices similar to those used in

15 this case.  This methodology properly holds the mortgage fraudster responsible for the loan

16 money received as a result of the fraud, but appropriately deducts from the loss amount the

17 fair market value of the collateral, as suggested by Application Note 3(E)(ii) to U.S.S.G.

18 §2B1.1.  This is the methodology recommended by the government and employed by the

19 Presentence Report to determine actual loss.

20    Subtracting the value of collateral at the time of sentencing from the mortgage loan

21 proceeds to determine actual loss to lenders was employed the Eighth Circuit in *United States*

22 *v. Parish*, 565 F.3d 528 (8th Cir. 2009) in determining loss for sentencing purposes.

23 According to the court in *Parish:*

24        Pursuant to U.S.S.G. § 2B1.1, the equation used to calculate actual loss to the lenders
          is the amount of the fraudulently obtained mortgage loans minus any payments made
25        on the loan principal and the value of the collateral at the time of sentencing.  *See*

26 _____

27        [2] It is important to note that the loss calculations necessary to determine restitution under § 3663,
   and the loss determination necessary for guidelines purposes under USSG § 2B1.1 are distinct.  The
   purpose of restitution is restorative, to compensate the victims of the offense conduct for harm caused by
28 the defendants.

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 7

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

U.S.S.G. § 2B1.1 app. n. 3 (E)(I) and (E)(ii). The government submitted evidence to the district court that the defendants fraudulently obtained 195 mortgage loans from twenty-four separate lending institutions, resulting in defendants receiving approximately $85 million in loan proceeds. Therefore, we take the amount of the loan proceeds-$85,020,128-and subtract the value of the 195 homes built by PMDC and used as collateral.

*Id.* at 535. The government in *Parish* provided the district court with a comparative analysis of the market value of comparable homes to those built by the defendant. This value was multiplied by the number of properties for which fraudulent loans had been obtained to determine an approximate value of the collateral at the time of sentencing.

The First Circuit recently endorsed this approach of "first determin[ing] the total amount of the loan issued for each of the flipped properties, and subtract[ing] from that number the considerably lower amount the land-flippers paid for the piece of property in question . . . [so that the] latter quantity serve[s] as a proxy for the true amount of the security the lender held on the property." *United States v. Innarelli*, 524 F.3d 286, 290-91 (1st Cir. 2008), *cert. denied*, 129 S.Ct 350 (2008).

The Ninth Circuit in *United States v. Allen*, 88 F.3d 765 (1996) presented useful guidance for this court to follow in determining a reasonable estimation of loss. Citing decisions from other circuits, the court in *Allen* held that "actual loss" must take into account the amount recovered or reasonably anticipated to be recovered from collateral that secured the loan, and loan payments made prior to default. *Id.* at 770 citing *United States v. Rothberg*, 954 F.2d 217, 219 (4th Cir. 1992) *United States v. Baum*, 974 F.2d 496, 499 (4th Cir. 1992); *United States v. Smith*, 951 F.2d at 1167-68.

The district court in *Allen* found the minimum loss to be $70,255.75. Based on the record below, the court determined that this figure was derived from testimony finding the gross loan value totaled $170,412.68; the proceeds realized from repossession and resale of properties equaled $100,156.93; and the loan payments made prior to default totaled $54,989.15. Finding that the district court properly subtracted the resale proceeds from the gross loan value, the court affirmed the loss determination of $70,255.75.

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP - 8

UNITED STATES ATTORNEY
700 Stewart Street, Suite S220
Seattle, Washington 98101-1271
(206) 553-7970

1    The defendant in *Allen* argued that the district court should also have subtracted the

2    $54,989.15 of loan payments made prior to default when calculating the actual loss, thereby

3    reducing the actual loss to $15,266.60.  Denying this argument, the court noted that the loan

4    payments had been credited by the bank towards interest, not principal.  Citing decisions

5    from other circuits approving of the inclusion of accrued interest as part of the actual loss

6    calculation, the court in *Allen* noted that the district court was not asked to include accrued

7    interest as part of the actual loss calculation.  88 F.3d at 771, citing *United States v. Gilberg*,

8    75 F.3d 15, 19 (1st Cir. 1996)(accrued interest included in the loss calculation under §

9    2F1.1); *United States v. Henderson*, 19 F.3d 917, 928 (5th Cir.)(same), *cert. denied*, 130 L.

10   Ed. 2d 137, 115 S. Ct. 207 (1994); *United States v. Jones*, 933 F.2d 353, 354-55 (6th Cir.

11   1991)(same); *United States v. Allender*, 62 F.3d 909, 917 (7th Cir. 1995)(same), *cert. denied*,

12   133 L. Ed. 2d 732, 116 S. Ct. 781 (1996); *United States v. Lowder*, 5 F.3d 467, 471 (10th Cir.

13   1993)(same); *contra United States v. Hoyle*, 33 F.3d 415, 419 (4th Cir. 1994)(loss calculation

14   under § 2F1.1 should not include accrued interest), *cert. denied*, 130 L. Ed. 2d 892, 115 S.

15   Ct. 949 (1995).  The court found that had the district court included the accrued interest, then

16   interest payments made prior to default would have been taken into account. See U.S.S.G. §

17   2F1.1 comment. (n.7(b)) ("the loss is the amount of the loan not repaid. . ."); *Rothberg*, 954

18   F.2d at 219; *Baum*, 974 F.2d at 499; *Smith*, 951 F.2d at 1167-68. The district court in *Allen*

19   used only the loan principal to calculate the "amount of the loan"; it did not consider the

20   accrued interest.  Using this approach, payments made towards interest could not be

21   considered as repayments made on the loan.  The court affirmed the district court's exclusion

22   of the $ 54,989.15 in interest payments from the loss calculation.

23    Similarly, the court in *Allen* affirmed the district court's refusal to consider the interest

24   proceeds from the non-defaulting loans.  The defendant argued that the court should have

25   considered the interest income from these loans claiming it was inconsistent to aggregate

26   losses from defaulting loans and ignore gains from non-defaulting loans.  The court affirmed

27   the district court's rejection of  this argument.  Finding the calculations consistent, the court

28   noted that the district court did not include as part of the loss the interest income the bank lost

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

as a result of default, and therefore did not set off against the loss the interest income received from non-defaulting loans.  Contrary to defendant's argument, the court found it was the lost interest income associated with the defaulting loans, not the amount of the unpaid principal, that is the counterpart of the interest income derived from the non-defaulting loans. The interest income lost on the defaulting loans was not included. Therefore, interest income from the non-defaulting loans should not have been included either.

Finally, in a determination applicable to this case, the court in *Allen* ruled that the district court also correctly refused to include payments made on current outstanding loans. For these loans, the risk of default on the then current loans was offset by the current an d prospective amount of income to be collected.  Recognizing the difficulty of accurately estimating the default risk and factoring it into the loss calculation, the court concluded that any prospective income should not be considered.  88 F.3d at 771, citing *Smith*, 951 F.2d at 1169 and *United States v. Hughes*, 775 F. Supp. 348, 351 (E.D. Cal. 1991).  Finding that the district court's determination that future losses and profits were too speculative to consider was not clearly erroneous, the court in *Allen* concluded that it was inappropriate to consider the loan payments made on the outstanding current loans.  *Id.*

In summary, the guideline application notes, as applied by the courts, advocate applying the following methodology to the loss determination in this case:

- Aggregate the gross loan value of all loans procured by the defendants during the pendency of the charged scheme provided the identified loans were obtained using one or more fraudulent representations;
- Deduct the gross loan value of all loans for which the lender or loan servicing company is not currently reporting a loss or the borrower is not in default;
- Deduct the fair market value of the pledged collateral (measured at or about the time of sentencing) from the aggregate value of all fraudulently obtained loans that were either foreclosed or are presently in default status; and

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 10

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

- Do not include as part of the loss the interest income the lender lost as a result of default and do not set off against the loss the interest income received from non-defaulting loans.

2. **There Is Sufficient and Reliable Information To Support A Reasonable Loss Estimation Of More Than $2.5 Million But Less Than $7.0 Million**

The government offers the attached Declaration of James C. Vach as evidence supportive of a reasonable loss estimation of more than $2.5 million but likely less than $7.0 attributable to the charged and admitted mortgage fraud scheme. As noted in the Declaration, Mr. Vach is a Consumer Fraud Analyst employed by the United States Postal Inspection Service. He has actively contributed to the government's investigation and prosecution of this mortgage fraud scheme. One of the tasks he undertook was to contact all of the lenders identified by the government as extending one of seventy-three (73) loans known to have been obtained using fraudulent representations. The fraudulently obtained loans were listed in a document entitled "Fraud Book." The Book, a copy of which is attached to the Declaration as Exhibit A, formed the basis of the charged scheme and was provided in discovery to all the defendants.

Mr. Vach's declaration details his efforts to identify the current lender or loan servicing company for each of the identified loans. Vach Dec. at ¶ 4. Each identified lender or servicing company was asked to provide current information regarding the loan status. For those loans identified as being in default status, the lender or servicing company was asked to provide the current fair market value of the property. Applying the methodology discussed in the preceding section, Mr. Vach assembled the requested information in a second document entitled "Losses from Lenders." The loss document, a copy of which is attached to the Declaration as Exhibit B, was provided to all of the defendants. In addition, all of the defendants were given copies of documentation received from the lenders and servicing companies to substantiate the losses. The government is unaware of any similar efforts being undertaken by the defendants, either collectively or individually.

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 11

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

As candidly admitted above, the government's proffered loss estimate is not precise. The guidelines and applicable case law do not, however, require precision. They merely require a reasonable estimation.

**B.     The Scheme To Defraud Was Devised And Implemented Using Sophisticated Means**

The government disagrees with the Probation Office's decision not to apply the two level enhancement authorized by U.S.S.G. §2B1.1(b)(9) for offenses otherwise involving sophisticated means. Application Note 8(C) to Section 2B1.1 states that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

Numerous courts have affirmed the district court's application of this enhancement in the context of similar mortgage fraud schemes. *United States v. Septon*, 557 F.3d 934, 935-36, 937 (8th Cir. 2009) (defendant directed his employees to submit fraudulent documents to lenders concealing the fact that defendant was providing bridge loans to buyers for their down payments; that defendant used his businesses to act as sham employers for borrowers in order to falsely verify and the nature and sources of income; that loan applications falsely inflated borrowers' assets and income; and contained false tax returns, pay stubs, gift letters, bank statements, and bank notes); *United States v. Dinnall*, 2009 WL 405365 (11th Cir. 2009) (unpublished) (defendant created and submitted to lenders fraudulent employment and earnings statements in eleven loan applications for borrowers, including fraudulent forms to verify employment, W-2 statements, payroll stubs, bank account statements, and other information, and who listed the phone numbers of friends and relatives on the employment records and recruited those individuals to verify the false information); *United States v. Wright*, 496 F.3d 371, 377-78 (5th Cir. 2007) (defendant used his own funds to purchase cashier's checks for closing costs in the names of the loan applicants, made copies of the same checks which were forwarded to the lenders, then deposited the same cashier's checks into his account); *United States v. Small*, 210 Fed. Appx. 776 (10th Cir. 2006) (unpublished) (defendant employed shell corporations, false financial

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 12

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

statements and fictitious persons); *United States v. Edelmann*, 458 F.3d 791, 815-16 (8th Cir. 2006) (defendant created numerous false documents, including multiple years of tax returns, supporting documents, such as W-2 and 1099 forms, bank statements, articles of incorporation, profit and loss statements, and bank letters); *United States v. Amico*, 416 F.3d 163, 169 (2nd Cir. 2005) (defendant used false bank documents; the solicitation and creation of false appraisals; the creation of false blueprints; submission of false blueprints to town officials in order to inflate the assessment of home values; collusion with the attorney representing many of the purchasers at closing); *United States v. Moncrief*, 133 Fed. Appx. 924 (5th Cir. 2004)(unpublished), certiorari granted, judgment vacated by *Moncrief v. United States*, 544 U.S. 1029 (2005) (sophisticated means was employed in mortgage fraud scheme).

As outlined above in the excerpted agreed factual statement, Defendant Sobol and his co-defendants employed many, if not most, of the means relied upon by courts in the above cited decisions to support application of the sophisticated means enhancement.  Mr. Sobol himself created and oversaw the creation of false closing documents.  Those false documents were used to conceal from lenders, and in some cases borrowers, the true nature of the purchase transaction.  Operation of the escrow company facilitated control over the closing process, preventing lenders from discovering the fraud.  This concealment was essential to the success of the scheme.  It permitted the fraud to continue unabated for over two years.

C.   **The Scheme To Defraud Involved Ten (10) Or More Victims**

Both the government and the Probation Office contend the two (2) level enhancement authorized by USSG §2B1.1.(b)(2)(A) is applicable because the charged and agreed scheme involved ten (10) or more victims.  As noted in the Declaration of James C. Vach, filed contemporaneously with this memorandum, the government identified twelve (12) lenders who extended loans on the basis of false and fraudulent information submitted by those participating in the scheme.  Vach Declaration at ¶ 3.  Information recently developed to assist the court in establishing a reasonable estimate of the losses attributable to the fraud scheme identified ten (10) lenders or servicing companies reporting losses from loans extended on the basis of false and fraudulent information.  Vach Declaration at ¶ 5.

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 13

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**D.    Defendant David Sobol Managed Emerald City Escrow**

The government anticipates that Mr. Sobol will seek to avoid the application of any aggravating role enhancement by arguing that he exercised no meaningful management duties at Emerald City Escrow.  This argument is inconsistent with the agreed facts.  As cited above, Mr. Sobol acknowledged that he "managed the day-to-day office operations of Emerald City."  Included in those responsibilities were maintaining banking accounts and making some personnel decisions.  While his initial knowledge of the escrow process was limited, he quickly learned the business.  The daily functioning of Emerald City was dependent on his efforts.  Application of the three (3) level enhancement for manager or supervisors of any criminal activity is appropriate in this case.

## IV.   RECOMMENDATION & JUSTIFICATION

**A.    Criminal Fine, Restitution, Supervised Release**

The government believes that Mr. Sobol lacks the necessary resources to pay both a criminal fine and the mandatory restitution obligation to be sought by the government.  Consequently, the government will not oppose a request that the fine be waived.

The charged conduct to which Mr. Sobol pled guilty involved offenses "committed by fraud or deceit," imposing a mandatory restitution obligation.  18 U.S.C. §3663A(c)(1)(A)(ii).  Section 3663A(d) of the Mandatory Victim Restitution Act provides that "[a]n order of restitution under [the Act] shall be issued and enforced in accordance with section 3664.  18 U.S.C. § 3663A(d).  Determining the appropriate restitution amount in this case presents some legal and factual issues requiring supplemental briefing and testimony.  This court has scheduled a joint restitution hearing for January 29, 2010.

Finally, the government concurs with the Probation Office's recommendation to impose a three year term of supervision.  Three years of oversight is necessary to reduce the likelihood of recidivism.

**B.    Term of Imprisonment**

In consideration of the following factors set forth in 18 U.S.C. § 3553(a), together with an advisory guideline range capped by the statutory maximum of sixty (60) months as

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 14

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

advocated by the government, the government recommends that this Court sentence Defendant David Sobol to twenty-four (24) months of imprisonment.

### 1.       The Nature and Circumstances of the Offense

Unfortunately, the mortgage fraud scheme perpetrated by Defendant Sobol and his co-conspirators in this case was not unique.  Prosecutors nationwide are investigating and have charged numerous schemes involving the same, or similar, deceptive acts. http://www.fbi.gov/publications/fraud/mortgage_fraud08.htm.  The tremendous scale of the problem has led many to label mortgage fraud as a significant contributor to our nation's financial problems.  Fraud perpetrated by those involved in the mortgage lending industry has caused massive losses to lenders and is responsible for the failure of banks and private lending institutions.  Investors in mortgage backed securities have lost funds needed for income and retirement.  Home values have been distorted by inflated appraisals leading to a shortage of affordable housing.  Foreclosures caused by mortgage fraud have riddled neighborhoods with abandoned houses and properties in disrepair.

A consistent sustained increase in home values led to relaxed loan underwriting standards.  Loan applications, appraisals, and real estate closing documents were not closely scrutinized because the residential real estate industry assumed the rising real estate values would insure that lenders would recoup their funds from the sale of the home if they had to foreclose.  In addition, it was assumed that homeowners unable to afford their mortgage payments would simply re-finance based on the ever increasing value of their homes.

Several professionals in the residential real estate industry, including Defendant Sobol and his co-defendants in this case, seized on opportunities presented by these market conditions.  They took advantage of the decreased scrutiny and a rising market by orchestrating real estate transactions using fraudulently inflated prices, falsified borrower qualification documents, and sham closings to divert loan proceeds to themselves.  Lenders were left with both unqualified borrowers lacking the resources to honor their loan commitment, and overvalued properties to securitize the debt.  The well documented collapse

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 15

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   of the residential real estate market exposed the fraud.  Lenders could no longer look solely

2   to the pledged properties to recover their losses.

3       The government anticipates that one or more of the defendants will seek to rely on the

4   decreased scrutiny in the residential real estate lending markets as a mitigating factor for their

5   own conduct.  Any suggestion that this Court should discount a particular defendant's

6   personal responsibility for preparing and submitting fraudulent documents and making false

7   representations in an orchestrated effort to obtain loan proceeds should be summarily denied.

8       There is no basis in the law or equity for the proposition that criminal conduct be

9   excused because the victim failed to take adequate measures to protect themselves or their

10  property.  The relaxed underwriting standards employed by lenders prior to collapse of the

11  residential real estate market were neither an invitation to commit fraud nor an excuse for

12  those unscrupulous enough to steal.

13      The particular scheme charged and admitted to by Mr. Sobol, while not unique in its

14  methodology, required the collaborative efforts of mortgage brokers, loan officers,

15  accountants, and escrow closers.  Each played a vital role in developing, implementing and

16  perpetuating the scheme.  Any one of the scheme participants could have withdrawn and

17  reported the illegal activity.

18          **2.      History and Characteristics of the Defendant**

19      Mr. Sobol worked as a real estate agent for a couple of years before starting Emerald

20  City Escrow.  He was generally familiar with the escrow process from his employment as a

21  real estate agent but had not worked in the escrow industry.  He was essentially recruited by

22  his wife and co-defendant, Alla Sobol, to operate Emerald City with co-defendant Donata

23  Baydovskiy.  While Mr. Sobol may not have been an organizer of the scheme, his

24  management of the escrow operations facilitated diversion of fraudulently obtained loan

25  proceeds and concealed the scheme from lenders and some borrowers.

26      As noted in the parties' Plea Agreement, Mr. Sobol agreed to cooperate fully in the

27  government's investigation of the charged scheme.  He has honored that commitment by

28

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 16

providing information related to the activities of his co-defendants as well as others in the mortgage industry.

### 3.   Reflect Seriousness of Offense, Promote Respect for the Law, and Provide Just Punishment

As noted in sub-section 1 above, the mortgage fraud scheme perpetrated by Mr. Sobol and his co-conspirators was largely successful due to relaxed oversight by lenders.  Lenders relied, to their detriment, on the truthfulness of representations made by Mr. Sobol and his co-conspirators regarding a borrower's purported qualifications and the value of the properties to be pledged as security for the fraudulently obtained loans.  Motivated by simple greed and the perceived reduced risk of detection, Mr. Sobol and his colleagues were undeterred by ethical constraints to make true and accurate representations regarding property values and a prospective borrower's creditworthiness.

The recommended twenty-four (24) month term of imprisonment would go a long way toward signaling to the entire real estate industry the seriousness with which fraudulent practices will be sanctioned.  The standards of honesty and transparency so readily abused and ignored by the defendants in this case would best be served by significant terms of imprisonment.  Judicial recognition that dishonest business practices will not be excused regardless of "market conditions" would be underscored by imposing the requested sentence.

### 4.   Afford Adequate Deterrence to Criminal Conduct

The government has every reason to believe that this prosecution, together with a custodial sentence of the requested duration, would deter Mr. Sobol from engaging in further criminal conduct.  An equally important consideration, however, is the deterrent effect this prosecution and the resulting sentences will have on the broader real estate and mortgage lending industries.  As discussed above, countless others employed in the mortgage lending industry profited from using many of the same fraudulent practices prosecuted in this case.[3]

---

[3]The Mortgage Asset Research Institute's March 2009 report to the Mortgage Bankers Association reports that "fraud incidence is at an all-time high," and "[e]merging fraud trends are further draining lender, law enforcement, and consumer resources in the industry's most challenging times." http://www.marisolutions.com/resources-news/press-release-20090316.asp There were 63,713 mortgage fraud related suspicious activity reports filed with FinCEN in fiscal

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 17

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   These professionals presumably engaged in a risk analysis, concluding that the threat

2   of detection and accountability was outweighed by the loan proceeds so readily stolen from

3   lenders and unwitting borrowers.  The significant terms of imprisonment sought by the

4   government for all of the defendants in this case would signal to others in the industry an

5   increased risk to engaging in similar fraudulent conduct, tipping the balance in favor of

6   honest and transparent business dealings.

7   **5.   Avoid Unwarranted Sentence Disparity Among Defendants**

8   Mr. Sobol was one of three individuals identified as the principals responsible for the

9   formation of Emerald City Escrow.  The remaining two principals were co-defendant Donata

10  Baydovskiy and an attorney whose law license, and corresponding IOLTA account, were

11  used to operate the escrow business.  Donata Baydovskiy was not involved in the day-to-day

12  operations of Emerald City.  She did, however, actively participate in numerous closings,

13  particularly those originated by her husband and co-defendant, Vladislav Baydovskiy.  The

14  government has not formulated a sentencing recommendation for Donata Baydovskiy but

15  anticipates seeking a custodial term of no more than that sought for Mr. Sobol.

16  **V.   CONCLUSION**

17  The mortgage fraud scheme perpetrated by Mr. Sobol and his co-defendants took

18  advantage of market conditions that enabled those motivated by dishonest intentions to reap

19  significant benefits with very little risk of detection.  Fueled by greed, without any apparent

20  regard for ethical business dealings, Mr. Sobol and his co-defendants were undeterred in their

21  collective pursuit for fraudulent loans.  It was not until the near collapse of the real estate

22  markets and the corresponding tightening of lending standards that the defendants' activities

23  //

24  //

25  //

26  //

27

28  year 2008, compared to 17,127 such reports in fiscal year 2004 --an increase of 370%.

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   were slowed.  The sentences this court will impose on Mr. Sobol and his co-defendants

2   provide an opportunity to send the message that mortgage fraud, not unlike any other fraud,

3   will be sanctioned as serious criminal conduct.  The government's recommended sentences

4   accomplish this objective.

5              DATED this 30th day of November, 2009

6

7                                    Respectfully submitted,

8                                    JENNY A. DURKAN
                                     United States Attorney
9
                                     /s/ James D. Oesterle
10                                   JAMES D. OESTERLE
                                     WSBA # 16399
11                                   Assistant United States Attorney
                                     United States Attorney's Office
12                                   700 Stewart Street, Ste. 5220
                                     Seattle, WA 98101
13                                   Facsimile:  206-553-2502
                                     Phone:  206-553-5040
14                                   E-mail: jim.oesterle@usdoj.gov

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 19

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1

### CERTIFICATE OF SERVICE

2        I HEREBY CERTIFY that on November 30, 2009 I electronically filed the foregoing

3   with the Clerk of the Court using the CM/ECF system, which will send notification of such

4   filing to the attorneys of record for the defendants.

5

6                                              */s/ Kimberly King*
                                              KIMBERLY KING
7                                              Legal Assistant
                                              United States Attorney's Office
8                                              700 Stewart Street, Ste. 5220
                                              Seattle, Washington 98101
9                                              Phone: (206) 553-5127
                                              Fax:   (206) 553-2502
10                                             E-mail: Kimberly.King3@usdoj.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Government's Sentencing Memorandum
Sobol, David
Baydovskiy et al., CR-09-0084-MJP) - 20